2016 NOV -7 AM 8: 46


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| | ) | DIVISION ONE |
| STATE OF WASHINGTON, | ) | No. 72941-1-I |
| Respondent, | ) | UNPUBLISHED OPINION |
| v. | ) | |
| MARIO ALBERTO ONTIVEROS, | ) | |
| Appellant. | ) | FILED: November 7, 2016 |

DWYER, J. — Mario Ontiveros appeals from the judgment entered on a jury's verdict finding him guilty of two counts of child molestation in the first degree, two counts of assault in the fourth degree, and one count of communicating with a minor for immoral purposes. He contends that the trial court violated his constitutional right to present a defense, violated his constitutional right to be present at all critical stages of the trial, admitted irrelevant and prejudicial testimony, and violated his right to a jury trial. Finding no error, we affirm.

I

In 2004, 16-year-old Ontiveros moved from Texas to Washington to live with his sister, Autumne, and her husband, Brad West.[1] Ontiveros resided in

_____

[1] Because Autumne and Brad share a surname they are referred to by their first names for clarity.

Washington for approximately two years. During this time, Brad's daughter from a previous marriage, K.W., also stayed with her father every other weekend during the school year, some holidays, and various weeks during the summer.

One afternoon in 2006, when she was 11 years old, K.W. called her mother and asked to be picked up early from her father's house. During the drive home, K.W. told her mother that, earlier that same day, Ontiveros told her that he was masturbating, asked her if she knew how to masturbate, and suggested that he could show her how. At that time, K.W. stated that Ontiveros had not touched her. When they arrived home, K.W.'s mother called Brad, her ex-husband, and discussed what K.W. had told her. Brad confronted Ontiveros, who, Brad testified, admitted to having the aforementioned conversation with K.W. Brad told Ontiveros to leave the house. Ontiveros returned to Texas soon after.

K.W. testified that she struggled with depression in high school and, as a result, began to cut herself. K.W. revealed her self-harm to her mother, explaining that she had not told her mother about everything that Ontiveros did to her when she was younger. K.W. asked her mother for counseling. K.W. began seeing a therapist, Logan Roth, and, during their first session, told Roth that a man living in her father's house had touched her breasts and entered her room every night when she was younger. Roth did not report the abuse to the police or child protective services. K.W. voluntarily ended her treatment with Roth and later reported to her high school counselor that she had been molested. This counselor reported the allegations to the police.

In August of 2012, police questioned Ontiveros about the incidents over the telephone. Ontiveros first denied having any sexual contact with K.W. but, after repeated questioning, later admitted that K.W. may have seen him masturbating once and that he may have touched her breasts a few times while tickling her. Two years later, Ontiveros was charged with four counts of child molestation in the first degree and one count of communication with a minor for immoral purposes.

The jury found Ontiveros guilty of two counts of child molestation in the first degree, two counts of assault in the fourth degree, and one count of communication with a minor for immoral purposes. The trial court imposed a standard-range sentence of 78 months to life in prison on the child molestation convictions. No jail time was imposed on the assault or communication convictions. Ontiveros timely appealed.

II

Ontiveros first contends that the trial court violated his constitutional right to present a defense. This is so, he asserts, because the court excluded his expert witness's testimony regarding false confessions. Ontiveros's argument is unavailing.

Trial courts have broad discretion in determining whether expert testimony should be admitted. We review such rulings for abuse of discretion. State v. Rafay, 168 Wn. App. 734, 783-84, 285 P.3d 83 (2012). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the

factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). While the right to present defense witnesses is a fundamental element of due process, State v. Franklin, 180 Wn.2d 371, 382, 325 P.3d 159 (2014); State v. Ellis, 136 Wn.2d 498, 527, 963 P.2d 843 (1998), the right is not absolute. The proffered evidence must be relevant and helpful to the trier of fact. Ellis, 136 Wn.2d at 533.

ER 702 regulates expert witness testimony and provides, in pertinent part, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Prior to trial, Ontiveros sought to introduce the trial testimony of Dr. Deborah Connolly. Connolly was prepared to testify about false confessions generally. Additionally, Ontiveros contended that Connolly would have testified specifically to: (1) various interrogation techniques used by the detective during his interview with Ontiveros, including the "guilt presumptive" and "minimization and sequential requests" techniques; (2) her opinion that Ontiveros "appeared to be receptive to minimization and option-posing strategies"; and (3) her opinion that Ontiveros's confession should be "treated with great caution."[2]

---

[2] Connolly's written report discusses several studies and academic papers, which together constituted the offer of proof before the trial court. The portions of these studies that related to Ontiveros's confession, and to which Connolly was prepared to testify, were included in her report. At no time prior to preparing the report did Connolly speak to Ontiveros.

We have previously examined expert testimony regarding false confessions in State v. Rafay, 168 Wn. App. 734, a case referenced by the trial court in ruling Connolly's testimony inadmissible. In Rafay, we upheld the trial court's order excluding expert testimony on false confessions, in part, because the testimony would not "provide any method for the trier of fact to analyze the effect of the general concepts on the reliability of the defendants' confessions." 168 Wn. App. at 789.

Connolly's report describes guilt presumptive, confrontational, and minimization/option-posing interrogation techniques and briefly explains the relevant research relating to such techniques. Connolly opines that Ontiveros was susceptible to the interrogation techniques used by the detective who questioned him, and offers that "some individuals interpret [minimization and sequential requests] as implicit offers of leniency. When it becomes clear to an individual that continued denial is futile, and when the individual is offered a way to minimize culpability, a confession or admission is a reasonable option."

Connolly's report also includes a study on academic dishonesty in which various interrogation techniques—or no techniques at all—were used on participants in order to determine which techniques produced higher rates of false confessions. When no tactics were used, 46 percent of the guilty participants confessed and 6 percent of the innocent participants confessed. When the interrogators used minimization and leniency tactics, 87 percent of the

guilty participants confessed and 43 percent of the innocent participants confessed.[3]

Although Connolly opines that Ontiveros "was amenable" to these strategies, the report does not state (1) that Ontiveros was susceptible to falsely confessing, or (2) that any interrogation technique used on Ontiveros was more likely to produce false confessions than legitimate confessions. The minimization and leniency techniques Connolly was prepared to testify to may produce more false confessions than other techniques, but the report indicates that they also produce more legitimate confessions.

There is nothing in the record to indicate that Connolly would have testified that, in her opinion, Ontiveros's confession was false. At most, the testimony would have been that the criticized techniques result in more confessions (both true and false). Because of this, the testimony would have merely advised the jury to treat the confession with caution.[4] Ontiveros has not identified anything in Connolly's report that would have assisted the jurors in analyzing the evidence before them.

In reaching a verdict, the jury was tasked with deciding whether Ontiveros was guilty or not guilty and, thus, whether his confession was true or false. Connolly's testimony would not have assisted the jury in making such a determination. Moreover, although Connolly would have testified that the

---

[3] The report presumes—but does not explain how—the results of a study on academic dishonesty are relevant to police interrogations.

[4] Although courts may instruct juries to treat certain testimony with caution, such as accomplice testimony, State v. Harris, 102 Wn.2d 148, 685 P.2d 584 (1984), such an instruction sets forth a legal principle. This differs from the testimony as to facts expected from a witness.

interview techniques used on Ontiveros are likely to increase the frequency of confessions, this testimony would not have provided the jury with a method to distinguish between false confessions and legitimate confessions. Such testimony does not make the existence of a fact at issue more or less likely to be true. ER 401. Thus, it was irrelevant. ER 402.

The trial court's ruling purported to exclude Connolly's testimony on the basis that Connolly does not know if Ontiveros is innocent: "[s]o the testimony is only relevant if the person, in fact, was innocent. And that is, of course, the ultimate question for the jury anyway, and so it is not useful to the trier of fact." Although the trial court relied on Rafay in issuing its ruling, its stated reason for excluding the testimony misstates the scope of Rafay's holding.

Under the trial court's reasoning, expert testimony regarding false confessions might never be admissible. To the contrary, such testimony may be properly admitted in certain circumstances. For instance, such testimony may be helpful to the jury in situations where the defendant has a specific personality or mental disorder that renders them particularly vulnerable to coercive interrogation methods. See United States v. Shay, 57 F.3d 126, 133 (1st Cir. 1995) ("[W]hether or not the jury had the capacity to generally assess the reliability of these statements in light of the other evidence in the case, it plainly was unqualified to determine without assistance the particular issue of whether [the defendant] may have made false statements against his own interests because he suffered from a mental disorder.").

We do not go so far as to say that expert testimony on false confessions may only be admitted in matters in which the defendant suffers from a personality or mental disorder. However, Connolly's proposed testimony would not have presented the jury with any information that would have aided the jurors in determining a fact in issue. Thus, the trial court's ruling was within the range of acceptable choices afforded to it. State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012); Littlefield, 133 Wn.2d at 47. There was no error.

III

Ontiveros next contends that the trial court violated his constitutional right to be present during all critical stages of the trial. This is so, he asserts, because the trial court and the attorneys discussed and formulated answers to questions from the deliberating jury at a time when Ontiveros was not in the courtroom.

Both the federal and state constitutions provide criminal defendants with a right to be present during critical stages of the trial. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 22. Pursuant to Washington's constitution, this right applies at any stage of the trial when the defendant's substantial rights may be affected. State v. Irby, 170 Wn.2d 874, 885-86, 246 P.3d 796 (2011). A defendant does not have a right to be present during a conference between the court and counsel on legal matters, unless those matters require the resolution of disputed facts. In re Pers. Restraint of Lord, 123 Wn.2d 296, 306, 868 P.2d 835 (1994).

During its deliberations, the jury sent seven written inquiries to the trial judge. The various inquiries asked about the prosecutor's charging decisions

and inquired about specific pieces of evidence. The trial court notified the attorneys, who appeared in court, and the judge and counsel formulated answers to the jury's questions. Ontiveros was not present during this discussion. After receiving input from counsel, the court responded to the jury's questions regarding the prosecutor's charging decisions by stating, "[t]he Court cannot comment on charging decisions." Regarding the jury's evidentiary questions, the court answered, "[q]uestions about the facts of the case concern evidence. The parties having rested, no further evidence will be introduced."

After the trial court sent these responses to the jury, Ontiveros's counsel requested that the court provide additional answers to the jury. Specifically, Ontiveros's counsel requested that the court instruct the jury that the charges are not evidence, that the jury can consider both the evidence and lack of evidence, and that the State has the burden to prove all elements of each offense beyond a reasonable doubt.[5] The court did not respond to this request because, at that time, the jurors indicated that they had reached a verdict. Before hearing the verdict, counsel for Ontiveros stated that Ontiveros had not been present for the formulation of the court's responses to the jury's questions. There was no objection interposed at this time, as counsel for Ontiveros was unsure whether such a discussion constituted a critical stage of the trial requiring Ontiveros's presence. After the adverse verdicts, Ontiveros moved for a new trial on the ground that he was not present for the formulation of the answers which, he

---

[5] The trial court properly issued these instructions before deliberations began. Ontiveros's counsel thus requested that the court instruct the jury on these matters a second time.

asserted, constituted a critical stage of the trial. The motion for a new trial was denied.

On appeal, Ontiveros again asserts that the trial court's formulation of the responses to the jury's inquiries outside of his presence violated his constitutional right to be present for all critical stages of the trial. This is so, he contends, for two reasons: (1) because any communication between a judge and the jury during a critical stage of the trial is prohibited, and (2) because the jury's questions were factual in nature and formulating a proper answer required a knowledge of the facts of the case. Ontiveros is wrong on both counts.

Ontiveros's first contention is without merit. Ontiveros has not established that this was a critical stage of the trial that required his personal presence. The trial court's responses to the jury questions herein were akin to supplemental jury instructions, which may properly be given during deliberation. CrR 6.15(f); State v. Becklin, 163 Wn.2d 519, 529-30, 182 P.3d 944 (2008). A trial court's decision to give or decline to give supplemental jury instructions is within its discretion. State v. Brown, 132 Wn.2d 529, 612, 940 P.2d 546 (1997). Providing the jury with requested information on a point of law is not a critical stage that required Ontiveros's personal presence in addition to that of his counsel. State v. Brown, 29 Wn. App. 11, 16, 627 P.2d 132 (1981); State v. Jury, 19 Wn. App. 256, 270, 576 P.2d 1302 (1978).[6]

---

[6] Ontiveros relies on State v. Caliguri, 99 Wn.2d 501, 664 P.2d 466 (1983), to support his assertion that any communication between a judge and the jury outside of the presence of the defendant is prohibited. The comparison is inapposite. In Caliguri, the trial court replayed tape recordings for the deliberating jury—essentially giving the jury an opportunity to perceive the evidence anew out of the presence of the defendant, including statements that had originally been redacted. The trial court herein provided the jury with no such opportunity.

As for Ontiveros's second contention, although the jury asked questions regarding the facts, the trial court's responses were not factual in nature. Rather, the court's answers set forth legal principles. Moreover, the trial court's responses were "entirely neutral". State v. Russell, 25 Wn. App. 933, 948, 611 P.2d 1320 (1980). The court's responses to the jury's inquiries were "negative in character and conveyed no affirmative information." State v. Safford, 24 Wn. App. 783, 794, 604 P.2d 980 (1979). Thus, there was no error.

Ontiveros asserts that, were he personally present when the trial court formulated its answers to the jury's questions, his attorney may have consulted with him and may have asked for additional instructions before the jury finished deliberating. This is pure speculation. Indeed, the supplemental jury instructions eventually requested by defense counsel were duplicative of instructions already given. The trial court could have properly refused to reissue those instructions even if the request to do so had been timely made. State v. Hightower, 36 Wn. App. 536, 549, 676 P.2d 1016 (1984). Finally, the event itself (issuing supplemental jury instructions) is not a critical stage. Jury, 19 Wn. App. at 270. The trial court did not err in responding to the jury's inquiries.

IV

Ontiveros next asserts that the trial court erred by permitting testimony by K.W. and her therapist, Roth, regarding K.W.'s self-harm and K.W.'s opinion as to why she engaged in self-harm. This is so, he contends, because permitting the aforementioned testimony was prejudicial, irrelevant, and materially affected the outcome of the case.

The trial court has broad discretion in balancing the probative value of evidence against its prejudicial impact and we will not reverse the trial court's decision absent a manifest abuse of that discretion. State v. Rivers, 129 Wn.2d 697, 710, 921 P.2d 495 (1996); State v. Greathouse, 113 Wn. App. 889, 918, 56 P.3d 569 (2002).

Pursuant to ER 402, only relevant evidence is admissible at trial. ER 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence." However, even relevant evidence must be excluded when its probative value is substantially outweighed by the danger of unfair prejudice. ER 403. "'[U]nfair prejudice" is that which is more likely to arouse an emotional response than a rational decision by the jury'" and "suggest[s] a decision on an improper basis." State v. Cronin, 142 Wn.2d 568, 584, 14 P.3d 752 (2000) (first alteration in original) (quoting State v. Gould, 58 Wn. App. 175, 183, 791 P.2d 569 (1990)).

Prior to trial, Ontiveros moved to exclude evidence that K.W. had engaged in self-harm, as well as K.W.'s opinion that her self-harm was a result of her sexual abuse. The trial court ruled that K.W. could testify as to her self-harm, and what she believed to be her reasons for harming herself, in order to explain why she entered therapy. At trial, K.W. testified that she engaged in self-harm to cope with the trauma of her sexual abuse. Similarly, Roth testified at trial that K.W. disclosed her self-harm during their first therapy session and that K.W.

believed her depression, self-harm, and inability to sleep were caused by her sexual abuse.

On cross-examination, counsel for Ontiveros questioned Roth as to why some people might engage in self-harm. Roth responded, "[t]hat would have to come from them directly." On re-direct, Roth stated that she had not reached any conclusions as to why K.W. was harming herself, but believed that a person is able to determine for themselves why they are doing so.

Ontiveros asserts that the aforementioned testimony was irrelevant and prejudicial. He also takes issue with the opinion testimony offered by Roth despite the trial court's ruling in limine that Roth could not testify as an expert witness.[7]

We review the trial court's decisions on this testimony to determine whether the decisions were manifestly unreasonable, based on untenable grounds, or made for untenable reasons. Sisouvanh, 175 Wn.2d at 623; Gould, 58 Wn. App. at 180. The trial judge ruled that K.W.'s testimony regarding her self-harm was admissible on the question of why she entered therapy.[8] Roth's testimony was limited to that which K.W. told her during therapy and was admitted for the same purpose as K.W.'s testimony. The trial court's ruling is at least "fairly debatable" and, thus, does not constitute an abuse of discretion. Walker v. Bangs, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979).

---

[7] Although Roth was not permitted to testify as an expert, the State conceded at trial that Roth's testimony regarding why people might engage in self-harm was opinion testimony that required a jury instruction on the use of expert testimony.

[8] This is a case of delayed reporting. That a person delays in reporting a sexual assault can give rise to an inference that the traumatic event likely did not happen. K.W.'s testimony on her need for therapy also served to rebut that inference.

-13-

With regard to the opinion testimony given by Roth, the only such testimony was first elicited by Ontiveros's own counsel. When defense counsel asked Roth's opinion as to why some people engage in self-harm, the door was opened for the State to inquire on the same subject on redirect. See, e.g., State v. Jones, 111 Wn.2d 239, 248-49, 759 P.2d 1183 (1988) (holding that questioning by defense counsel opened the door for the prosecution to ask about otherwise inadmissible evidence).

There was no trial court error.

V

Finally, Ontiveros contends that the trial court denied him his right to a jury trial. This denial, he asserts, arose from the trial court's ruling prohibiting Ontiveros from questioning potential jurors about specific wrongful conviction cases.

Trial courts have broad discretion in determining the scope and extent of voir dire. CrR 6.4(b); State v. Frederiksen, 40 Wn. App. 749, 752, 700 P.2d 369 (1985). "The trial court's exercise of discretion is limited only by the need to assure a fair trial by an impartial jury." Frederiksen, 40 Wn. App. at 752 (citing United States v. Jones, 722 F.2d 528, 529 (9th Cir. 1983)). We will reverse a trial court's ruling on the scope of voir dire only for an abuse of discretion and only if the defendant shows that the abuse substantially prejudiced him. State v. Brady, 116 Wn. App. 143, 147, 64 P.3d 1258 (2003) (citing State v. Davis, 141 Wn.2d 798, 825-26, 10 P.3d 977 (2000)). "The refusal to permit specific questions is not reversible error absent an abuse of discretion, which will be

found only if the questioning is not reasonably sufficient to test the jury for bias or partiality." Frederiksen, 40 Wn. App. at 752.

Prior to conducting voir dire, the trial court prohibited Ontiveros's attorneys from questioning potential jurors about specific cases involving wrongful convictions. The court clarified that general questions about a potential juror's concerns, including concerns about a person's guilt or innocence, would be permitted, stating, "I will only preclude lawyers from raising specific questions either by name or by particular facts".

Ontiveros contends that such a prohibition was an abuse of discretion that resulted in substantial prejudice to his cause. In support of this proposition, Ontiveros cites to State v. Brady, 116 Wn. App. 143. However, the comparison is inapt. In Brady, the trial court allotted time for all attorneys to use for voir dire, but then ended voir dire before that time expired. We held in Brady that the trial court abused its discretion because it "changed the rules" part way through the voir dire. 116 Wn. App. at 148-49. The trial court in Brady abused its discretion because the parties had initially set aside important questions, only to later discover that they would be unable to pursue those lines of questioning.

This is not such a case. The trial court here set the rules for voir dire beforehand and did not alter those rules thereafter. Counsel was permitted to question jurors about concerns they may have had regarding a party's guilt or innocence and respond to any juror questions about specific cases.

Ontiveros speculates that, had his counsel been permitted to ask about specific, wrongful conviction cases, a juror may have revealed a bias deserving

-15-

of a preemptory challenge. However, Ontiveros has not demonstrated why the line of permitted questioning—regarding a juror's concerns about guilt or innocence—was insufficient to explore these biases. Consequently, Ontiveros does not establish that the trial court's prohibition substantially prejudiced him. There was no error.

Affirmed.

We concur: